Filed 11/30/20  In re E.H. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.H., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARIA H.,<br><br>    Defendant and Appellant. | G059178<br><br>(Super. Ct. No. 18DP1163)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Katherine E. Lewis, Judge.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

Maria H. (Mother) appeals from the juvenile court's judgment terminating her parental rights to her daughter E.H.  Mother claims the court erred by not applying the sibling relationship exception to terminating parental rights.  We disagree and affirm the judgment.

## FACTS

In November 2018, the Orange County Social Services Agency (SSA) filed an application for a protective custody warrant for newborn E.H. due to Mother's open dependency case with E.H.'s sister, 10-year-old C.H.  C.H. was removed from Mother's custody because of Mother's neglect and failure to protect C.H. from sexual abuse by Mother's boyfriend P.M., who was E.H.'s father (Father).[1]  To support its determination E.H. was at risk, SSA cited to Mother's decision to conceive and give birth to E.H. with C.H.'s abuser, Father.  The juvenile court denied SSA's application, ruling it failed to state facts sufficient to establish probable cause.

### I.  Detention

Two days later, SSA filed a petition and detention report.  In the petition, SSA alleged Mother failed to protect E.H. or stop the abuse of a sibling.  (Welf. & Inst. Code, § 300, subds. (b)(1), (j), all further statutory references are to the Welfare and Institutions Code.)  The petition alleged Mother received limited prenatal care during her pregnancy with E.H., Father sexually abused E.H.'s older half-sibling C.H., Mother had a history of substance abuse issues and criminal history, and Father had possible unresolved mental health issues and a history of domestic violence and other criminal activity.

Following a detention hearing, the juvenile court concluded a prima facie case had been made and ordered E.H. detained.  The court ordered six hours of

---

[1]  Father is not a party to this appeal.

2

supervised visitation per week for Mother. The court set a jurisdiction hearing in January 2019.

## II. *Jurisdiction & Disposition*

In a jurisdiction/disposition report, the social worker stated one-month-old E.H. had been placed with C.H. in their maternal aunt and uncle's home; Mother had not seen C.H. in six months. The social worker reported Mother said she did not believe Father sexually abused C.H. because "he is not that type of person." Mother did not believe C.H.'s allegations and called her "a liar." Mother stated she and Father agreed that she would move out and find an apartment for her, C.H., and E.H., but Father would continue to help Mother.

In addendum reports, the social worker reported Mother indicated Father moved out of the apartment the previous month, and she had not communicated with him since then. However, the maternal aunt told the social worker that she thought they were still living together. Mother's supervised visitation was increased from six to 10 hours per week.

At the jurisdiction hearing, the juvenile court found the allegations true and declared E.H. a dependent of the court pursuant to section 300, subdivisions (b) and (j). The court set a six-month review hearing for August 13, 2019. The court ordered family reunification services for Mother, which included a sexual abuse treatment program and parenting education classes.

The following month, SSA was notified the caregivers had neglected E.H. The social worker reported four-month-old E.H. suffered five seizures in the preceding month, and it was not until the fifth seizure that her maternal aunt and uncle took her to the emergency room. SSA substantiated the severe medical neglect allegations and detained both E.H. and C.H. at Orangewood Children and Family Center (Orangewood). In a 15-Day Review Report, the social work reported C.H.'s main concern was being able

3

to visit E.H. who was residing in another cottage. The social worker indicated that at staff's encouragement, C.H. visited E.H. whenever she wanted.

*III. Six-Month Review*

In the six-month review report, SSA recommended terminating Mother's reunification services and finding suitable placement. The social worker reported E.H. and C.H. were placed in a home with Dora A. The social worker stated Mother had made very minimal efforts in complying with her case plan. Mother had not participated in counseling services. Mother completed a parenting class, but the social worker could not determine whether Mother gained any insights/knowledge because she failed to present herself at scheduled monthly compliance appointments. Mother refused to participate in the parenting education portion of the UCI Focus Sexual Abuse Counseling program. Mother's visitation was not consistent and her interactions during visitation were non-engaging.

The social worker reported Mother continued to not believe Father sexually abused C.H. Mother advised the social worker she continued to have a connection to Father because he paid her rent. The social worker opined Mother had failed to gain insight into the severity of C.H.'s sexual abuse trauma and had not developed protective capacities. The social worker added Mother demonstrated "an inability to care or protect the child, [E.H.], from future or potential abuse and neglect by [F]ather and others."

The social worker reported that although Dora A. was able to provide for all of E.H.'s needs, she was not interested in providing a permanent placement or home for E.H. and C.H. Due to the sibling's need for permanency and concurrent placement, the social worker indicated SSA was considering an adoptive home. The social worker stated E.H. and C.H. and the prospective adoptive parents completed a visit, which went well, and the prospective adoptive parents were interested in moving forward. The social worker reported E.H. and C.H. would soon be placed together with non-relative

4

prospective adoptive parents and every effort would be made to maintain the siblings together.

At the six-month review hearing, Mother and the social worker both testified. At the conclusion of the hearing, the court found that by a preponderance of the evidence return of E.H. to the parents would create substantial risk of detriment to her safety, protection, or physical or emotional well-being. Additionally, the court found reasonable services had been provided to Mother and her progress was minimal. The court terminated Mother's reunification services and set a section 366.26 hearing for January 2020.

*IV. Section 366.26 Hearing*

In a December 2019, section 366.26 report, SSA recommended the juvenile court terminate parental rights, find E.H. adoptable, refer her for adoptive placement, and set a post-permanent plan review hearing. The social worker reported E.H. and C.H. were placed in the care of the prospective adoptive parents (caregivers) three months earlier.

The social worker reported E.H. was a 13-month-old baby girl with big brown eyes, big cheeks, and thick black hair, who loved to smile and watch C.H. play. E.H. liked to crawl and was very curious. Although E.H. was too young to make a statement, she loved C.H. and her foster brother. E.H. had been diagnosed with Hypotonia or floppy baby syndrome, which results in the child having low muscle tone involving reduced muscle strength. She was delayed in her ability to support her weight on her legs. E.H. had made progress in her development and she was now able to sit up and support her weight for longer periods of time.

The social worker explained a nurse conducted a developmental screening on E.H. and she scored below the cutoff in all five areas of development. E.H. was

5

participating in early start infant programs at the Orange County Regional Center to address her developmental delay.

The social worker reported E.H. was comfortable around her caregivers. E.H. and C.H. were observed to be happy and relaxed in the home. When the social worker conducted monthly face-to-face visits, the social worker asked C.H. if she felt she and E.H. were safe in their current placement, and C.H. had expressed feeling safe with their caregivers. E.H. appeared to have a positive attachment with her caregivers. The social worker observed the home and E.H.'s living area to be clean. The social worker reported the prospective adoptive parents had committed their time to care for the children and they expressed interest in pursuing adoption of E.H. and C.H. The caregiver ensured E.H. and C.H. attended all appointments related to their medical, mental health, developmental, and educational needs.

The social worker stated the caregivers described Mother's visitation since E.H. and C.H. were placed with them as being "'okay.'" The caregivers reported that during visits Mother held E.H., changed her diaper, and fed her. Mother also sang to E.H. to make her laugh. Mother talked to C.H. about E.H. and left C.H. playing with her cell phone. Although Mother brought C.H. small gifts, Mother bought a name banner for E.H. instead of C.H., who had asked for one. During this reporting period, Mother had not been consistent in visitation.

The social worker reported the caregivers provided E.H. with her basic necessities and special medical care for her epilepsy, and ensured E.H. was obtaining services for her developmental delays. E.H., C.H., and the caregivers participated in Wraparound services aimed at helping with the adjustment to the new placement and in improving C.H.'s behaviors. The caregivers maintained monthly contact with the social worker and adhered to the visitation plan for E.H. and Mother. E.H. appeared to be comfortable with the caregivers, was doing well, and appeared to be adjusting favorably

6

to her placement. She made progress in her development while in her current placement. The social worker noted it was beneficial for E.H. to be placed together with C.H., since E.H. has resided with C.H. since birth.

In an addendum report, SSA recommended the juvenile court determine termination of parental rights was not detrimental to E.H.'s well-being, and she was adoptable but difficult to place. SSA also informed the court there was now a need to find a different adoptive family. The social worker met with the caregiver, who stated she went from having no children to caring for three children with special needs in the last year. The caregiver said it had been a big change, however, she was getting accustomed to the transition. The caregiver indicated her husband was working two jobs and she was the primary caregiver for the children. The caregiver stated her husband was struggling with the transition of having three children in the home. The caregivers' other foster care child had cystic fibrosis and required special medical care. The caregiver stated she and her husband were 100 percent sure they want to adopt E.H. However, they were not confident they also wanted to adopt C.H. at that time. The caregiver stated she wanted to adopt C.H. too, but her husband was apprehensive and felt he needed more time to make the decision because he worried about her sexual trauma history. The caregiver stated her husband was "'very cautious'" with C.H. The social worker suggested her husband work with C.H.'s therapist, but the caregiver said his work schedule made it difficult for him to participate in the children's services. The caregiver reported they wished they had more time to make a decision about adopting C.H. The caregiver stated she and her husband would be willing to try being C.H.'s legal guardians for purposes of developing her permanent plan and indicated legal guardianship would likely lead to them deciding to adopt C.H.

The social worker reported C.H.'s therapist stated C.H. was displaying behavior that was normal for a child who was sexually abused. C.H. wanted the foster

7

dad to hold her and sit close together, but the caregiver's husband was feeling uncomfortable. The therapist indicated C.H. attached easily and had difficulty with boundaries. The therapist believed C.H. had a history of feeling rejection and was sensitive towards her baby sister, E.H., because Mother demonstrated preferential treatment towards E.H. Additionally, C.H. may had sensed the foster dad was giving more attention to E.H.

The social worker reported she had a telephone meeting with the caregiver to discuss the children's permanent plan. The caregiver said she and her husband would like more time to make a decision on adopting both E.H. and C.H. The caregiver said they did not want to separate the siblings, but they would like more time to get to know C.H. and feel confident in their decision to adopt her.

On the date scheduled for the section 366.26 hearing, the juvenile court continued the matter to allow the social worker to assess adoption for both children or do letters of guardianship for C.H.

In an addendum report prior to the scheduled hearing, the social worker reported the caregivers were in the process of buying a home. The caregiver stated that if they get approved to buy the new home, they will have more space, and everyone would have their own room. They were planning to stay in Orange County so C.H. did not have to move schools. The social worker reviewed the upcoming court hearing for both E.H. and C.H. and stated it was SSA's recommendation for the court to order adoption for E.H. and legal guardianship for C.H. The social worker reviewed the guardianship letters and obtained signed copies. The caregiver expressed she and her husband were happy they would be the children's forever home. The caregiver expressed the feeling is "'unreal'" and they are excited.

Due to a COVID-19 emergency order, the juvenile court continued the matter. On the date of the hearing, the court allowed counsel to appear by telephone. The court continued the matter again.

In an addendum report, SSA recommended the juvenile court authorize E.H. to move to Los Angeles County with the current prospective adoptive parents. The social worker reported the caregiver's husband was laid off due to COVID 19, and they could no longer purchase a home in Orange County. The caregiver stated she had an opportunity to move into a bigger home in Los Angeles County where they will be able to save money and her husband had been offered a job that would bring them financial security. The caregiver's mother had a three-bedroom home the family could move into for a very low monthly rent payment. The caregiver stated she would continue to drive to Orange County for the children's medical appointments and visitations.

At a May 2020 telephonic hearing, Mother objected to out-of-county placement and requested a hearing. Mother was opposed to E.H. and C.H. living in Los Angeles County and requested the court defer the issue until the next hearing date. SSA requested the court authorize the caregivers plan to move to Los Angeles County with the children. E.H.'s counsel agreed with authorizing the children to move to Los Angeles County. The court authorized E.H. to move to Los Angeles County with the caregivers. The court continued the section 366.26 hearing again.

In an addendum report, the social worker reported she had face-to-face contact via video chat with the caregiver and C.H. and E.H. The social worker advised the caregiver the court had approved the move to Los Angeles County. C.H. appeared to be in a happy mood as evidenced by her smiling, giggling, and engaging in the meeting. The caregiver was holding and feeding E.H. throughout the meeting. The family was happy the court approved the move to Los Angeles County. C.H. stated she was "'excited,'" and had picked out special bedding and decorations for her new room. The

social worker reported she had a second face-to-face contact via video chat with the caregiver and C.H. and E.H. The children were clean and appropriately dressed, and the home was sufficiently clean and organized. The caregiver said they would move into their new home in Los Angeles County about two weeks later. The caregiver expressed they would miss Orange County, but they were excited about having more space. The caregiver's husband started his new job as an apartment manager where he would have job stability and flexibility for the children's appointments. The caregiver stated she continued to feel good caring for the children and their special medical needs. The caregiver said they strongly believe they will adopt C.H. at some point in the future and they would never want E.H. and C.H. to be separated.

At the section 366.26 hearing, the juvenile court admitted all the reports into evidence, and Mother was the sole witness. Mother testified that throughout the dependency proceedings she always visited E.H. Mother said that during visits she fed E.H., changed her diaper, and brought her gifts. E.H. would always reach out to her and would give her a kiss on the check. E.H. would also laugh with Mother. Mother would walk around with E.H. showing her toys and would show her cartoons. When visits were at the mall, Mother would put E.H. on all the playground toys. She also comforted E.H. when she was sad, hungry, or upset. Mother testified C.H. and E.H. were very close and loved each other very much. Mother said she wanted the two girls to be placed together. Mother asked the court not to terminate her parental rights to either daughter.

At the conclusion of the hearing, the juvenile court found E.H. generally and specifically adoptable by clear and convincing evidence. In considering the sibling benefit, the court concluded there was no indication the sibling bond would be severed should the caregivers adopt E.H. because the caregivers intended to keep the siblings together. The court indicated it was mere speculation to think the caregivers would someday sever the sibling bond because legal guardianship is not as permanent as

10

adoption. The court opined it was just as likely that in the future the caregivers might also want to adopt C.H. Alternatively, the court concluded that even in the unlikely event the siblings were separated, E.H., then one year and seven months, would be sad, but that sadness would not be so tremendous such that it would outweigh the benefits E.H. would gain from adoption. The court found Mother had not met her burden in proving the risk of harm caused by severing the sibling benefit relationship outweighed the benefits of adoption for E.H. The court terminated Mother's parental rights and selected adoption as E.H.'s permanent plan, finding none of the exceptions to adoption applied. Mother filed a timely notice of appeal.

DISCUSSION

Mother contends the juvenile court erred by failing to apply the sibling relationship exception to adoption. We disagree.

"Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child due to'" some specified statutory exception. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*); § 366.26, subd. (c)(1).) One such exception is the "substantial interference with a child's sibling relationship." (§ 366.26, subd. (c)(1)(B)(v).)

Application of the sibling relationship exception calls for a two-step analysis. "[T]he court is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship . . . ." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-952 (*L.Y.L.*).) It does so "by evaluating the nature and extent of the relationship, including whether the child and sibling were raised in the same house, shared significant common experiences or have existing close and strong bonds." (*Id.* at p. 952; § 366.26, subd. (c)(1)(B)(v).) "[T]he parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the

11

child." (*L.Y.L., supra,* 101 Cal.App.4th at p. 952.)  Second, "[i]f the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*Ibid.*; § 366.26, subd. (c)(1)(B)(v).)  Application of the sibling relationship exception is rare, "particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount.  [Citation.]"  (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

Mother bears the burden of establishing the sibling relationship exception. (*Bailey J., supra,* 189 Cal.App.4th at p. 1314.)  We review the juvenile court's finding on whether adoption substantially interferes with sibling relationships for substantial evidence.  (*Ibid.*)  We "draw all reasonable inferences in support of the findings [and] consider the record most favorably to the juvenile court's order," without "evaluat[ing] the credibility of witnesses, reweigh[ing] the evidence, or resolv[ing] evidentiary conflicts."  (*L.Y.L., supra*, 101 Cal.App.4th at p. 947.)  We review the court's "'quintessentially discretionary'" balancing of the benefits of adoption against the interference with sibling relationships for an abuse of discretion.  (*Bailey J., supra*, 189 Cal.App.4th at p. 1314.)  As our Supreme Court stated in *In re Celine R.* (2003) 31 Cal.4th 45, 52, "'[o]nce reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.'  [Citation.]"

*I.  Step One*

The first step requires the juvenile court to determine whether terminating parental rights would substantially interfere with the sibling relationship.  In making this determination the court evaluates the nature and extent of the relationship, including whether the child and sibling were raised in the same house, shared significant common

12

experiences, or have existing close and strong bonds. (*L.Y.L., supra,* 101 Cal.App.4th at pp. 951-952.)

The most notable evidence of a bond between E.H. and C.H. is the fact they have been cared for in the same house since E.H.'s birth, but this alone does not establish a significant sibling relationship. (*L.Y.L., supra,* 101 Cal.App.4th at pp. 951-953 [consideration of all circumstances].) There is little evidence of shared common experiences. The only other evidence of a sibling bond is E.H. loves her big sister C.H. and while placed at Orangewood, C.H. wanted to and visited E.H. who was residing in another cottage.

Although Mother indicates the caregivers do not want to adopt C.H., this is only partially true. The caregivers do not want to adopt C.H. *at this time*, but they have not ruled out adopting C.H. They simply indicated they needed more time to make that decision. The caregivers were in complete agreement with serving as C.H.'s guardian as they were making the adoption decision. In fact, they proposed it. The court found there was no indication that if in the future the caregivers chose not to proceed with adoption, they would seek to end the guardianship. Mother cites to the caregiver's husband's failure to participate in services and apprehension with C.H. But during this time he worked two jobs, and the caregiver stated after he obtained a new job, his schedule was more flexible. The caregiver stated they never wanted E.H. and C.H. to be separated and "strongly believe" they will adopt C.H. Simply put, they needed more time with C.H. The court found it was sheer speculation the sibling relationship between E.H. and C.H. was at risk if Mother's parental rights were terminated. We agree.

The record does not reflect any likelihood termination of parental rights would interfere with any existing sibling relationship. Considering all of the evidence, we conclude substantial evidence supported the juvenile court's finding Mother failed to show a significant sibling relationship existed between the girls.

13

DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

IKOLA, J.

GOETHALS, J.